NATIONAL STARCH AND CHEMICAL CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
National Starch & Chemical Corp. v. Commissioner
Docket No. 31669-84.
United States Tax Court
T.C. Memo 1986-512; 1986 Tax Ct. Memo LEXIS 88; 52 T.C.M. (CCH) 804; T.C.M. (RIA) 86512; October 20, 1986. *88 P deducted investment banker's fees under sec. 162(a), I.R.C. 1954, as amended, purportedly incurred in conjunction with the acquisition of its stock in a "reverse subsidiary cash merger." However, P did not deduct other fees and expenses purportedly associated with the merger. P now contends that all its fees and expenses should have been deducted, and maintains that under Commissioner v. Lincoln Savings & Loan Assn.,403 U.S. 345 (1971), such fees and expenses are deductible because they did not create or enhance P's assets. P further urges that Lincoln Savings limits the scope of what is a material fact for the purpose of P's summary judgment motion. Held: In these circumstances, P must fully substantiate its expenses in order to fall within sec. 162(a), I.R.C. 1954, as amended. P has not done so. Lincoln Savings does not obviate this requirement. P's Motion for Summary Judgment is denied. Held further: In these circumstances, R cannot bind the Court to a concession that there are no genuine issues of material fact when the record indicates that material facts are clearly lacking. R's Cross-Motion for Summary Judgment is denied. Leonard E. Kust and Geoffrey Rowland Sayre *89 Brown, for the petitioner. Richard J. Sapinski, for the respondent. CANTREL
MEMORANDUN OPINION CANTREL, Special Trial Judge: This case is before the Court on petitioner's Motion for Summary Judgment, filed pursuant to Rule 121(a) on March 18, 1986, and respondent's Cross-Motion for Summary Judgment, filed pursuant to Rule 121(a) on May 30, 1986. [1]
In a notice of deficiency issued to petitioner on June 12, 1984, respondent determined a deficiency in petitioner's Federal income tax for the short tax year ended August 15, 1978 in the amount of $1,068,281. Petitioner had on its corporate tax return for that short year deducted a $2,225,586 "professional advisory fee" as an ordinary and necessary business expense under section 162(a). The fee was paid to Morgan Stanley & Company, Inc., investment bankers (hereinafter sometimes referred to as "Morgan Stanley"). Respondent determined in his notice that petitioner's *90 payment to Morgan Stanley was a capital expenditure.In its petition requesting a redetermination of this deficiency filed September 7, 1984, petitioner asked that we also determine an overpayment of income tax in the amount of $338,918. This claimed overpayment was due to "ancillary expenses" totalling $706,079 which petitioner now states were erroneously capitalized, but should have been deducted. The issues presented on these cross-motions are: 1. Whether petitioner's payment of $2,225,586 for services rendered by Morgan Stanley in conjunction with the merger into it of a second-tier subsidiary of Unilever United States, Inc. is deductible as an ordinary and necessary business expense under section 162(a); 2. Whether additional expenditures of petitioner totalling $706,079, also relating to the merger transaction and previously capitalization by petitioner, are deductible as ordinary and necessary business expenses under section 162(a); and 3. Whether, assuming all of petitioner's facts are true, the expenditures at issue in this case are nondeductible as a matter of law. For the reasons set forth hereinbelow, we do not reach these ultimate issues in this proceeding. Background *91 We treat the following facts as true for the purpose of ruling on these motion. Petitioner National Starch and Chemical Corporation was in October, 1977 a Delaware corporation with its principal place of business in New Jersey. Petitioner and its subsidiaries are engaged in the manufacture and sale of adhesives, starches and specialty chemical products. Prior to the transaction under scrutiny here, petitioner was a publicly held company and its shares were traded on the New York Stock Exchange. Frank K. Greenwall (hereinafter sometimes referred to as "Greenwall") organized petitioner in 1928 and was chairman of its executive committee as of October 7, 1977. He and his wife, Anna A. Greenwall, beneficially owned 14.4 percent of petitioner's 6,560,619 shares of common stock outstanding on September 30, 1977. Theirs was the largest block of petitioner's stock outstanding. They were 81 and 79 years old, respectively, at that time. The Greenwalls and certain other officers and directors of petitioner who owned its stock then had bases in their stock of less than $15 per share. On October 7, 1977, Felix Rohatyn (hereinafter referred to as "Rohatyn"), a partner in Lazard Freres & Company, *92 investment bankers, approached Greenwall and Donald D. Pascal (hereinafter referred to as "Pascal"), chairman of petitioner's board of directors. Rohatyn indicated that Unilever United States, Inc. (hereinafter referred to as "Unilever") was considering petitioner as a possible acquisition. He said that Unilever was not interested in an unfriendly tender offer and that it would proceed with discussions only if petitioner favored the offer and the Greenwalls would sell their shares. On October 11, 1977 Greenwall informed Oscar Reubhausen (hereinafter referred to as "Reubhausen"), a partner in the New York City law firm of Debevoise, Plimpton, Lyons & Gates (hereinafter referred to as "Debevoise") of the Unilever inquiry. This firm was counsel to both petitioner and the Greenwalls. Further discussions among Greenwall, Reubhausen, Pascal and two other Debevoise attorneys on the subject of the Unilever inquiry took place on October 17 and 18, 1977. They discussed tax and estate planning issues and other legal matters. On October 18, 1977 Greenwall contacted Rohatyn and told him that a cash sale would be unattractive to him in view of his own estate planning considerations. Greenwall, *93 Reubhausen, and Rohatyn met again on October 19, 1977 to discuss legal and other problems involved in structuring a transaction so that, among other things, an opportunity for a tax-free exchange would be available to petitioner's shareholders. Another meeting to discuss these and related matters took place on October 20, 1977. Attorneys from Debevoise met with Unilever's attorneys from the New York City law firm of Cravath, Swaine & Moore (hereinafter referred to as "Cravath") several times between October 21, 1977 and the end of the month to structure a deal acceptable to petitioner, Greenwall and Unilever. Rohatyn, Reubhausen and Greenwall were kept advised of and contributed to these discussions from time to time.It was understood that a decision by Greenwall as to whether he and his wife wished to dispose of the shares they controlled would be deferred pending the outcome of discussions among the lawyers. On November 3, 1977 attorneys from Debevoise and Cravath travelled to Washington, D.C. from New York City to discuss with personnel at the Internal Revenue Service the possibilities of a workable tax structure. Petitioner's board of directors was advised of the Unilever inquiry *94 and the continuing discussions on November 11, 1977. The board decided that even if an overall structure could be worked out, petitioner should obtain the advice of an independent investment banking firm before proceeding with negotiations.Greenwall called Robert Baldwin, president of Morgan Stanley on November 11, 1977 and requested a conference for November 14, 1977. Morgan Stanley was engaged by petitioner on the latter date. A number of conferences took place between November 17, 1977 and December 2, 1977 among Debevoise and Morgan Stanley personnel. Petitioner's operations, plus possible structures for a transaction with Unilever which might form a basis for negotiations, were discussed. By letter dated December 6, 1977, Managing Director Robert F. Greenhill (hereinafter referred to as "Greenhill") of Morgan Stanley advised Board Chairman Pascal as follows: * * * We understand that National Starch is interested in having Morgan Stanley review its strategic alternatives within the context both of the longer term situation of a 15 percent equity ownership in National Starch which at some point will be transferred from its present individual "founding" owners and of an evaluation *95 of an immediate proposed business combination involving Unilever. Greenhill's letter also described the types of services his company would render petitioner. These were preliminary analysis, review of alternatives, valuation, negotiating and structuring transactions, rendering an opinion and coordinating technical details. A document entitled "Project Buttondown," containing balance sheets, income statements, analyses of shareholders and subsidiaries and other data about petitioner, and balance sheets and income statements relating to Unilever and its parent, Unilever, N.V., was generated by Morgan Stanley on December 11, 1977. The source of the data compiled in this document is not known. Petitioner and Unilever entered into a Letter of Intent on December 11, 1977 after it was first approved by petitioner's board of directors at a special meeting. The basic structure agreed upon in the Letter of Intent was the merger of a secondtier subsidiary of Unilever into petitioner. More specifically, Unilever was to establish a first-tier subsidiary, initially referred to as Newco. Unilever would ultimately contribute to Newco an amount equal to $73.50 multiplied by the number of shares *96 of petitioner's common stock outstanding immediately before the merger. Contemporaneously with the solicitation of stockholders in connection with the merger, Newco would offer its cumulative preferred shares to holders of petitioner's common stock on a share-for-share basis. The preferred shares, if obtained by petitioner's shareholders in an exchange, would have a $73.50 liquidation preference. The Letter of Intent further contemplated that Newco would itself create a wholly-owned subsidiary, i.e., a second-tier subsidiary of Unilever. The second-tier subsidiary would merge into petitioner. At that time, those of petitioner's shareholders who had not exchanged their common stock for Newco's preferred stock would exchange their shares with Newco for $73.50 per share in cash. As a result of the proposed merger, petitioner would be a wholly-owned subsidiary of Newco, with Unilever owning all of Newco, except to the extent that petitioner's shareholders elected to receive Newco's preferred shares. The transaction was later described as a "reverse subsidiary cash merger." It would not be a reorganization for the purpose of section 368(a). The Letter of Intent specifically made the *97 agreement subject to the receipt of a ruling from the Internal Revenue Service, satisfactory to the principal shareholders, that the exchange of petitioner's common stock for Newco's preferred would not result in the recognition of gain or loss under section 351. The precise terms of an Agreement and Plan of Merger and Exchange Offer were settled upon after further negotiations. "Newco" became National Starch and Chemical Holding Corporation (hereinafter referred to as "Holding"), a Delaware corporation with authorized capital stock of 1,000 shares of common. The second-tier subsidiary became NSC Merger, Inc., a Delaware corporation with authorized and outstanding capital stock of 1,000 shares of common, all of which were held by Holding.The Agreement and Plan of Merger and Exchange Offer were approved by the Boards of Unilever and petitioner in March 1978. A favorable ruling was issued by the Internal Revenue Service on June 28, 1978. It stated that the exchange of petitioner's common stock for Holding's preferred would be "tax-free" under section 351 for those who so elected to exchange. The ruling was addressed to Philip S. Winterer of Debevoise. On July 10, 1978 petitioner's *98 board approved the earlier action of its executive committee in calling a special shareholders' meeting for August 15, 1978 and in authorizing the filing of proxy materials with the Securities and Exchange Commission. The board also approved the proxy materials and voted that they be sent to all shareholders of record. Furthermore, it approved Georgeson & Company as proxy solicitors. Also at the July 10, 1978 meeting, Greenhill of Morgan Stanley updated his firm's prior reports and delivered a letter expressing Morgan Stanley's opinion on the fairness of the proposed merger. The proxy materials contained the board of director's recommendation that the merger be approved. Attached as an exhibit to the proxy statement was the two page opinion of Morgan Stanley stating that the terms of the Agreement and Plan of Merger and Exchange Offer were fair and equitable. The proxy statement noted that Morgan Stanley has acted as financial adviser to the Company in connection with the Merger and Exchange Offer and assisted in the negotiation of the transactions on behalf of the Company. The Company has agreed to pay Morgan Stanley fees for its services as follows, depending on the outcome *99 of the Merger proposals: (a) whether or not the Merger is consummated, $500,000 plus out-of-pocket expenses including reasonable counsel fees, and (b) in the event the Merger is consummated, in addition to the amount set forth in clause (a), $1,700,000. * * * The proxy statement and also the Exchange Offer stated that the Greenwalls, who beneficially owned 14.4 percent of petitioner's stock, had agreed to vote their shares in the same proportion as the other shareholders voted. One of the conditions to the merger, set forth in the Agreement and Plan of Merger, was that stockholders who participated in the Exchange Offer would not be required to recognize gain or loss on the exchange of their common stock for Holding's preferred. Petitioner engaged Georgeson & Company to assist in the solicitation of proxies. The proxy statement said that petitioner would also request brokers, dealers, banks and their nominees to solicit proxies from their clients, and would reimburse them for reasonable expenses related thereto. Petitioner's shareholders approved the merger at their August 15, 1978 meeting. Thereafter, those shareholders who accepted the Exchange Offer exchanged their common shares *100 for a like number of Holding's preferred shares in a section 351 transaction. Approximately 21 percent of petitioner's common stock, including the 14.4 percent block beneficially owned by the Greenwalls, was exchanged in this manner. The use of section 351 enabled the Greenwalls to avoid recognition of at least $55,000,000 in long-term capital gains in the exchange. Petitioner's shareholders who did not elect to so exchange their stock received $73.50 in cash from Holding for each share held. NSC Merger, Inc. was then merged into petitioner under Delaware law in a transaction that did not fall within section 368(a). Each share of NSC Merger, Inc. stock held by Holding was converted into a single share of petitioner's common. Unilever's intention, as set forth in the proxy statement, was that petitioner continue its operations without substantial change after the merger. Petitioner's Certificate of Incorporation became the Certificate of Incorporation of the surviving corporation. Its Article FOURTH had been amended to read: FOURTH: The total number of shares which the Corporation shall have authority to issue is 1,000 shares of Common Stock, $1.00 par value. Morgan Stanley billed *101 petitioner $2,225,586.23 for services provided in connection with the merger. Its only billing statement, dated August 23, 1978, reads as follows: For financial advice rendered in
connection with the acquisition
of National Starch and Chemical
Corporation by Unilever N.V. [2]
$2,200,000.00
Out-of-pocket expenses
7,586.23
Fee and disbursements of counsel
18,000.00
Total
$2,225,586.23 Morgan Stanley's outside counsel was the New York Citylaw firm of Davis, Polk and Wardwell. Its one page statement of services rendered was attached to the Morgan Stanley statement. "Ancillary expenses" were also paid or incurred by petitioner in relation to the merger. Statements from Debevoise indicate $506,768.70 in services rendered to petitioner. Debevoise's statements are not itemized. At least one document in the record suggests that Debevoise's fees were in fact $406,768.70. Main Lafrentz & Company, certified public accountants, did not itemize its bills either, and it appears that some services for which petitioner was billed in connection with the merger may have *102 been rendered for Holding's benefit. This firm generated an interoffice communication on the deductibility of legal and investment advisory fees incurred in connection with the merger, but it bears a November 7, 1978 date. This memorandum refers to an evaluation relating to the effect of the merger transaction on Greenwall's personal interests. It states that the cost of the evaluation was personally absorbed by Greenwall. Little is known about fees billed to petitioner by Towers, Perrin, Foster & Crosby, employment consultants. It is not clear whether their services were rendered in connection with the merger. Its statements are not itemized or otherwise descriptive of its services. Miscellaneous ancillary expenditures of $213,396 seem to have been paid or incurred by petitioner in relation to the transaction as well.The payees cannot be determined, but the $213,396 figure appears to be part of the $706,079 that petitioner now seeks to deduct. All billings in the record were offered by respondent as exhibits to his Memorandum in Support of Notice of Objection. Petitioner deducted the Morgan Stanley fee on its Form 1120 return for the short taxable year ended August 15, 1978, *103 as ordinary and necessary business expenses under section 162(a). [3] Petitioner reported on the addendum to the return's Schedule M-1 that other professional fees of $772,292 relating to the acquisition of petitioner by Unilever had been deducted for book purposes but not for tax purposes. Respondent's notice of deficiency, dated June 12, 1984, determined a deficiency for the short tax year of $1,068,281. This was due to the $2,225,586 investment banker's fee he claims was erroneously deducted. A timely petition was filed with our Court on September 7, 1984. In addition to protesting the deficiency, petitioners asserted therein that respondent "erred in failing to reduce the income tax liability of Petitioner for the taxable period ended August 15, 1978 for certain expenses totalling $706,079," purportedly relating to the merger. It thus asked the Court to also determine an overpayment of tax in the amount of $338,918. An answer was filed on November 6, 1984. A limited amount of informal discovery apparently took place. As stated before, certain unitemized billings are included as respondent's exhibits to his Memorandum *104 in Support of Notice of Objection. Also included among those exhibits are numerous documents explaining the overall structure and tax ramifications of the merger transaction. The source of some of these exhibits is not entirely clear. [4]
Respondent served Interrogatories and a Request for Production of Documents on petitioner on January 14, 1986. Petitioner did not fully comply with discovery. Rather, petitioner informed respondent that all evidence relevant to the legal issues in its case had been turned over informally, and that it planned to file a motion for summary judgment. Petitioner then obtained respondent's consent to postpone its responses to the interrogatories and document production pending a ruling on its motion. Petitioner's Motion for Summary Judgment was filed on March 18, 1986. Respondent's Cross-Motion for Summary Judgment was filed on May 30, 1986. Petitioner's Reply and Response to Respondent's Motion for Summary Judgment was filed on June 20, 1986. The cross-motions came on before us in that posture on July 2, 1986. Petitioner's Motion for Summary Judgment
We first turn *105 to petitioner's motion. [5] *106 Petitioner argues that all its claimed expenditures are deductible under section 162(a) because they were ordinary and necessary expenses.[6] It asserts two arguments in support of this position. First, petitioner argues that its expenses were incurred to assist its board of directors in the proper discharge of its fiduciary duties in relation to Unilever's overtures. Citing Locke Manufacturing Companies v. United States,237 F. Supp. 80 (D.Conn. 1964), petitioner compares them to expenses incurred by corporations in the course of proxy fights, which petitioner claims are currently deductible provided they relate to matters of corporate policy.[7] *107 Secondly, and more emphatically, petitioner states that a broader legal principle supports the deductibility of both the Morgan Stanley fee and the ancillary expenditures. It asserts that the principal function of the "ordinary" requirement of section 162(a) is to distinguish a certain variety of expenditures from capital expenditures. Petitioner cites Commissioner v. Lincoln Savings & Loan Assn.,403 U.S. 345 (1971), for the rule that an expenditure must create or enhance what is essentially a separate and distinct asset in order for that expenditure to be characterized as capital.[8] *109 This leads petitioner to the conclusion that the expenditures in question must be ordinary, and therefore deductible, because they did not result in the creation or enhancement of any asset of petitioner. Given the rule of Lincoln Savings, further factual inquiries as to the nature and purpose of its expenditures, petitioner argues, would lead to immaterial facts. Petitioner states: It is immaterial for purposes of applying that principle to determine whether some part of the investment banker's fee is attributable to services for other than assistance to the Board of Directors in the *108 discharge of their fiduciary obligation or that the other expenses are for other services in connection with the transaction. This second ground for deductibility stems from the substance of the transaction as a purchase of Petitioner's stock. So understood, there was no "separate and distinct asset" of Petitioner which was "created or enhanced" by the transaction. * * * [9]
Petitioner further notes that since the "reverse subsidiary cash merger" was in substance a stock acquisition for cash by Holding, the general rules requiring capitalization in the true merger context do not apply. Then, falling back on Locke Manufacturing, petitioner again argues that the services in question were advisory, or concerned corporate policy matters only. It emphasizes in this regard that it was not actively seeking to be acquired when approached by Unilever. Thus the argument is that all of petitioner's $2,931,665 in expenditures are deductible under section 162(a). [10]
As a general rule, expenditures incurred to effect a corporate reorganization are not currently deductible. See Mills Estate v. Commissioner,206 F.2d 244, 246 (2d Cir. 1953); Missouri-Kansas Pipe Line Co. v. Commissioner,148 F.2d 460, 462 (3d Cir. 1945); [11]Motion Picture Capital Corporation v. Commissioner,80 F.2d 872, 874 (2d Cir. 1936). This rule has been applied to many types of corporate rearrangements, including those which do not fall within the definition of "reorganization" set forth in section 368(a). See United States v. Hilton Hotels Corp.,397 U.S. 580, 583 (1970); Bilar Tool & Die Corporation v. Commissioner,530 F.2d 708, 712 (6th Cir. 1976); Vulcan Materials Company v. United States,446 F.2d 690, 693 (5th Cir. 1971). Clearly, reorganization expenditures of the acquiring corporation in an *110 acquisitive reorganization are nondeductible. United States v. Hilton Hotels Corp.,supra.They are on a par with acquisition costs outside the context of reorganizations and are treated as part of the property's basis. The acquired corporation's reorganization costs are generally not deductible either, although the proper treatment of these expenditures is less frequently addressed. Cases in this area more often deal with the acquired corporation's reorganization costs in tax-free Type A reorganizations. See Motion Picture Capital Corporation v. Commissioner,supra;Vulcan Materials Company v. United States,supra at 694. [12]
In order for petitioner's purported reorganization expenditures to qualify as allowable deductions under section 162(a), each of the elements of that provision must be satisfied. The item must (1) be *111 "paid or incurred during the taxable year," (2) be for "carrying on any trade or business," (3) be an "expense," (4) be a "necessary" expense, and (5) be an "ordinary" expense. Commissioner v. Lincoln Savings & Loan Assn.,supra at 352. In addition, the item must be reasonable in amount. Whether an expenditure qualifies as an ordinary and necessary expense incurred in a trade or business is an issue of fact. Commissioner v. Heininger,320 U.S. 467, 475 (1943). A taxpayer must substantiate each element of an expenditure. 4A J. Mertens, Law of Federal Income Taxation, sec. 25.05 (1985). Regarding petitioner's motion for summary judgment, its burden of proof in this proceeding is to demonstrate that no genuine issue of material fact exists with respect to such expenditures, and that summary judgment may be rendered as a matter of law. Rule 121; Adickes v. Kress & Co.,398 U.S. 144, 157 (1970); Take v. Commissioner,82 T.C. 630, 633 (1984). All factual materials and inferences therefrom must be viewed in a light most favorable to the party opposing the motion. Adickes v. Kress & Co.,supra at 158-159. The "facts" upon which petitioner seeks to prevail on its motion are contained in *112 Herbert J. Baumgarten's Affidavit in Support of Motion for Summary Judgment and in the few exhibits attached to the Baumgarten affidavit. [13] Certain "critical facts" are set forth in the affidavit as follows: (16) The services performed by Morgan Stanley consisted of (i) advice to and consultation with the officers and directors of Petitioner to assist them in responding to the unsolicited offer of Unilever and in deciding whether to approve or disapprove the plan of merger and to recommend such approval or disapproval to the shareholders and (ii) the rendering of an opinion, in support of the decision of the Board of Directors of Petitioner to approve the plan of merger, that the terms of Unilever's offer were fair and equitable. (17) The Board of Directors had Petitioner engage the services of Morgan Stanley to assist the officers and directors of Petitioner in the proper discharge of their fiduciary obligation to Petitioner's shareholders. (18) Morgan Stanley was not hired by and did not render advice or services to Unilever, the Greenwalls or any other shareholders of Petitioner in connection with this transaction. (19) Petitioner paid Morgan Stanley from its own funds a total *113 of $2,225,586 for the services rendered in connection with the above described events and Petitioner was not reimbursed by Unilever, the Greenwalls or any other shareholders for any part of such fee. (20) Petitioner incurred expenses totalling $706,079 for legal fees, auditors' fees, printing costs of the proxy statement, proxy solicitation expenses, employee compensation consultants' fees and SEC filing and other fees (collectively, the "Ancillary Expenses"), all of which were necessary in connection with the transaction. * * * (23) The Ancillary Expenses were at the time incurred of a type and amount that was customary for a public company when acquired in a transaction such as the one described above. Baumgarten's statements do not indicate the nature and purpose of some $2,931,665 in expenditures purportedly made, or the reasonability of such expenditures. They do not indicate the payees involved or the precise amounts each payee received. Nor do they indicate the date on which such expenditures were incurred, or the beneficiaries of these payments. Such inquiries are material to the ultimate issue of whether expenditures are ordinary and necessary expenses paid or incurred in *114 carrying on a trade or business. The exhibits to the Baumgarten affidavit do not provide us with these basic facts, either. [14] *115 Exhibit A, Greenhill's letter to the chairman of petitioner's board of directors, merely outlines the type of services Morgan Stanley would be able to provide its client. Exhibit B, the Internal Revenue Service letter ruling, relates to petitioner's legal argument on summary judgment, not to material facts which petitioner must first establish in order to fall within section 162(a). [15] Exhibit C, the proxy materials, describes the form of the overall transaction and the numerous conditions to it. However, they do not indicate what services any payees actually performed, or when, or to what end. Neither can we say that these documents were the payees' work product. We find no itemized billings or other books of account among petitioner's exhibits, and would be surprised to learn that such records were not, in fact, kept. Petitioner argues, however, that *116 (a) its expenditures must have been ordinary because they do not fall within language in Commissioner v. Lincoln Savings & Loan Assn.,supra, relating to capital assets; [16] (b) that the very substance or structure of the merger was such that no asset of petitioner could have been created or enhanced; (c) that the facts material to its motion therefore relate to the substance or structure of the merger; and (d) to the extent that any are required, all material facts relating to the fiduciary nature of the expenditures are stated in Baumgarten's affidavit. Assuming arguendo that Lincoln Savings does apply as the test for whether the expenditures in this case were either capital or ordinary, we cannot at this point determine whether its expenditures created or enhanced any of petitioner's assets because petitioner has failed to substantiate them. We must first ascertain from all the relevant facts the nature, timing, amount, purpose and beneficiaries of petitioner's various expenditures. Only then can we determine whether, in fact, an asset has been created or enhanced, or has not been. We cannot make such a determination from the statements in Baumgarten's affidavit or from the exhibits *117 attached to it. At most, the exhibits set forth the structure of the transaction. Despite petitioner's novel legal argument, we find these to be insufficient. Based on the record, we cannot even ascertain whether petitioner's expenditures were incurred to carry on a trade or business. This is a fundamental requirement of section 162(a), to say the least. Moreover, we cannot ascertain whether statements 16 through 18 in Baumgarten's affidavit regarding the advisory and fiduciary nature of petitioner's expenditures are factually correct unless Baumgarten's statements are fully substantiated.We note in this respect that petitioner did not include any billings among the exhibits accompanying its motion. Rather, *118 all billings of expenditures incurred were produced by respondent in conjunction with his Notice of Objection. The bills are not itemized. Furthermore, as we note the very sizable figures involved in this case, we observe that the element of reasonableness is inherent in the term "ordinary and necessary." 4A J. Mertens, Law of Federal Income Taxation, sec. 25.12 (1985). The Court must also determine from relevant facts that petitioner's expenditures were reasonable under section 162(a). If we were to accept petitioner's argument that facts relating to the structure of the merger constitute the universe of material facts to be considered, a deduction for expenditures which only purportedly relate to petitioner's reorganization could be established simply on the strength of an allegation as to the amount of its expenditures, plus documentation relating merely to the structure of the transaction. On that rationale, we would be unable to ascertain if any one of petitioner's expenditures was in fact a non-business expenditure or was for the primary benefit of a particular shareholder. [17] *120 *121 We would be unable to determine the specific type or purpose of the services incurred, or the timing *119 of them. Even if Lincoln Savings ultimately applies, we cannot accept this approach. Furthermore, to the extent that petitioner has attempted to substantiate its expenditures by paragraphs 16 through 18 in Baumgarten's affidavit, we must state that these conclusory statements fail to eliminate material issues of fact. [18] We cannot determine as a matter of law that a purported expenditure is deductible under section 162(a) if we know virtually nothing about it. The expenditures contested in Lincoln Savings, as indicated by the Tax Court opinion, which was Court reviewed, were fully substantiated, particularly with respect to nature, purpose, timing and amount. Lincoln Savings & Loan Association v. Commissioner,51 T.C. 82 (1968). In our view, the Supreme Court in Lincoln Savings did not modify the substantiation requirement under section 162(a). Furthermore, Federal Courts of Appeal which have relied *122 on Lincoln Savings to find an ordinary expense under section 162(a) have based their decisions on findings of fact of the respective lower courts relating to nature, purpose, timing and amount of the expenditures in controversy. See NCNB Corporation v. United States,684 F.2d 285, 286 (4th Cir. 1982); [19]Briarcliff Candy Corporation v. Commissioner,475 F.2d 775 (2d Cir. 1973).; [20]Iowa-Des Moines National Bank v. Commissioner,592 F.2d 433, 434 (8th Cir. 1979). [21] We do not believe that these Courts of Appeal could have reached their decisions unaided by the lower courts' abundant findings of fact. The substantiating facts we lack are material facts. A dispute over them could affect the outcome of petitioner's motion for summary judgment under Lincoln Savings, assuming arguendo that it applies. See Anderson v. Liberty Lobby, Inc.,54 U.S.L.W. 4755, 4757 *123 (U.S. June 25, 1986), in which the Supreme Court stated: As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. [22]
Since the material facts we must have are not before us, we cannot hold that there is no genuine issue as to any material fact and that a decision may be rendered for petitioner as a matter of law. We must therefore deny its motion.
Respondent's Motion for Summary Judgment
We now turn to respondent's *124 cross-motion. The substance of his motion is as follows: [A]ssuming all petitioner contends is true, respondent submits that, as a matter of law, all of the challenged expenditures (the Morgan Stanley fee and the "Ancillary Expenses", whatever they might be) arose either out of the disposition of the stock of petitioner or out of the petitioner's acquisition of an intangible asset. [23]
Respondent thus concludes that petitioner's expenditures must have been capital in nature. He further asserts that the Court may grant a moving party's motion for summary judgment when the movant concedes that there is no genuine issue of material fact if the movant's theory is adopted but maintains that there is such an issue if the opponent's theory is adopted. Respondent cites Jacklin v. Commissioner,79 T.C. 340 (1982), for this proposition. We are reminded of petitioner's earlier argument on summary judgment when respondent states: While there are several potential purposes for the expenditures here at issue as enumerated in respondent's Memorandum in Support of Respondent's Notice of Objection * * * respondent submits that the Court need not decide the precise purpose for the expenditures. For *125 the purpose of this Motion, it does not matter whether the expenditures were primarily for the benefit of the petitioner on its own behalf or on behalf of its shareholders. Rather, the Court need only hold that the expenditures were capital expenditures. [24] *126 In its reply brief, petitioner does not counter that genuine issues of material fact exist with respect to respondent's motion. It takes issue with respondent's legal arguments only. As indicated, respondent asserts alternative arguments. First, he states that Woodward v. Commissioner,397 U.S. 572, 575 (1970), is dispositive. Woodward states that "[i]t has long been recognized, as a general matter, that costs incurred in the acquisition or disposition of a capital asset are to be treated as capital expenditures." Relying on Woodward, respondent claims that all petitioner's expenditures arose in connection with the disposition of petitioner's stock by its shareholders, and were therefore capital expenditures. His alternative argument is that the expenditures arose out of the acquisition of an intangible asset and were therefore capital in nature. Respondent finds that intangible asset described, albeit briefly, in petitioner's Progress Report for 1978: As anticipated, the merger with Unilever has not affected our organization or our real work of providing ever more and better service to out customers. We will benefit greatly from the availability of Unilever's enormous resources, *127 especially in the area of basic technology. [25]
For the purpose of his motion, both arguments rely on facts earlier urged upon us by petitioner which respondent now concedes are true. In order to grant respondent's motion on this overall approach, we would be required to assume that petitioner's obviously conflicting facts and assertions now contain no material issues of fact. Jacklin does not require this, or permit it. Inasmuch as Jacklin deals with concessions of fact in a cross-motion for summary judgment, it stands for the proposition that if a movant concedes certain material facts for the purpose of his summary judgment motion, and if the movant does not prevail, those same concessions cannot be used against the movant when the adversary's cross-motion is thereafter ruled on. See also McLain v. Commissioner,67 T.C. 775, 778 (1977). We do not read Jacklin to bind the Court to a party's concession that no genuine issues of material fact exist for the purpose of that party's cross-motion. We must still determine whether respondent's motion can be granted in accordance with the Rule 121 standard. *128 Indeed, we concluded in Jacklin, after a thorough consideration of the record, that genuine issues of material fact existed in petitioner's case on summary judgment, notwithstanding certain concessions of fact that petitioner had made solely for the purpose of her motion. We stated therein: "This case should be resolved on its facts and not as a matter of law." Jacklin v. Commissioner,supra at 352. As stated before, many of petitioner's "facts" in the Baumgarten affidavit are no more than conclusory statements. Furthermore, the exhibits to that affidavit do not supply us with necessary material facts regarding the nature, purpose, timing, amount or beneficiaries of petitioner's purported expenditures. Our decision to deny petitioner's motion was based on the recognition of this failure of proof. We cannot now base a decision in respondent's favor on a record replete with material issues of fact created by petitioner's failure to substantiate. Again, we are unable to determine whether an expenditure is capital if we know virtually nothing about it. We must therefore deny respondent's motion as well. This is not to submit that the cases cited by respondent are necessarily irrelevant. *129 In Bilar Tool and Die Corporation v. Commissioner,530 F.2d 708 (6th Cir. 1976), the Court of Appeals concluded on the basis of the trial record that attorneys' fees in a split-up were nondeductible capital outlays. The Court found that an intangible asset had been created by the expenditure. That intangible asset was a revised capital structure and its concommitant benefits. Even so, we cannot reach the issue of whether Bilar applies until we ascertain the nature and purpose of both the merger and the purported expenditures. We note the same with respect to Mills Estate v. Commissioner,206 F.2d 244 (2d Cir. 1953). The enterprise in Mills Estate underwent a recapitalization. It was found that the change in the corporate structure for the benefit of future operations gave the business an intangible asset. Expenditures made in effecting the recapitalization were therefore deemed capital in nature. Again, the conclusions reached by the Court were based on the entire record, which included a trial on the merits. [26] *130 As stated above, petitioner does not contend that issues of material fact exist with respect to respondent's motion. Rather, petitioner takes issue with respondent's two legal arguments, and responds with its own points and authorities. We have reviewed these arguments, but in keeping with the purpose of this summary judgment proceeding, we leave their ultimate consideration to the trier of fact. An appropriate order will be issued.
Footnotes
1. This case was assigned pursuant to sec. 7456(d)(4) and Rule 180. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise specified, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise specified.↩
2. Unilever N.V. is in fact the parent of Unilever United States, Inc., and not the parent of National Starch and Chemical Holding Corporation.↩
3. Petitioner appears to use the accrual method of accounting.↩
4. See Exhibits A through CC of Respondent's Memorandum in Support of Notice of Objection.↩
5. Rule 121 regarding summary judgments provides in pertinent part as follows: (a) General: Either party may move, with or without supporting affidavits, for a summary adjudication in his favor upon all or any part of the legal issues in controversy. * * * (b) Motion and Proceedings Thereon: * * * A decision shall thereafter be rendered if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law. A partial summary adjudication may be made which does not dispose of all the issues in the case. * * * (d) Form of Affidavits; Further Testimony; Defense Required: * * * When a motion for summary judgment is made and supported as provided in this Rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, a decision, if appropriate, may be entered against him. ↩
6. Sec. 162(a) reads in pertinent part as follows: "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *." The "necessary" requirement of sec. 162(a)↩ is not one that petitioner focuses on in this case. 7. In Locke Manufacturing Companies v. United States,237 F. Supp. 80 (D. Conn. 1964), expenses incurred by a corporation in relation to a proxy fight were held to be deductible under sec. 162(a). The Court reached its conclusion after a trial on the merits.
8. In Commissioner v. Lincoln Savings & Loan Assn.,403 U.S. 345, 359 (1971), the Supreme Court held that payments of additional premiums required by sec. 404(d) of the National Housing Act to the Federal Savings & Loan Insurance Corp.by a state-chartered savings and loan association were not deductible under sec. 162(a) as ordinary and necessary business expenses. See our additional discussion of this case infra.↩
9. Brief in Support of Petitioner's Motion for Summary Judgment, p. 2-3. ↩
10. As stated before, the $2,225,586 Morgan Stanley fee and the $706,079 in ancillary expenditures constitute this total figure.↩
11. Venue on appeal of this case lies in the United States Court of Appeals for the Third Circuit. See sec. 7482(b)(1)(B). ↩
12. The parties have found no authorities dealing with the tax treatment of expenses in reverse subsidiary cash mergers, and we have found no authorities squarely on point. We are therefore faced with matters of first impression in this case.↩
13. Baumgarten was vice president and counsel of petitioner at the time of the merger.↩
14. The attached exhibits are: 1. Exhibit A: Letter of Robert F. Greenhill, managing director of Morgan Stanley, dated December 6, 1977, to Donald D. Pascal, chairman of petitioner's board of directors. Attached to this letter is a second "confirmation" letter, signed by Pascal and accepted by Greenhill, establishing the terms under which Morgan Stanley was retained. 2. Exhibit B: Internal Revenue Service letter ruling, dated June 28, 1978, directed to Philips S. Winterer of the Debevoise law firm, regarding the tax consequences of the merger transaction. 3. Exhibit C: National Starch and Chemical Corporation Proxy Statement, dated July 10, 1978, including the Agreement and Plan of Merger and Exchange Offer. ↩
15. The Internal Revenue Service letter ruling was offered for the proposition that "the general rule requiring capitalization in the true merger context is not applicable to the expenditures incurred by Petitioner in connection with a merger in form but an acquisition of its stock in substance." Brief in Support of Petitioner's Motion for Summary Judgment, p. 17. That is, the ruling was not offered to provide a factual basis for the statements made in the Baumgarten affidavit. It was offered to support petitioner's argument that the transaction was more in the nature of a cash sale than a merger.↩
16. Lincoln Savings states that "[w]hat is important and controlling, we feel, is that the sec. 404(d) payment serves to creater or enhance for Lincoln what is essentially a separate and distinct additional asset and that, as an inevitable consequence, the payment is capital in nature and not an expense, let alone an ordinary expense, deductible under sec. 162(a) in the absence of other factors not established here." Commissioner v. Lincoln Savings & Loan Assn.,supra↩ at 354.
17. We note in this respect the Main Lafrentz & Company Interoffice Memorandum to J. Ward from J. Dengrove, dated November 7, 1978. It was given to respondent by petitioner during informal discovery and is Exhibit S to Respondent's Memorandum in Support of Notice of Objection. It states, at page 2, as follows: Although a question may arise as to whether any portion of the fees represents payment by the corporation of shareholders' expenses, in practice it is often assumed that the shareholders are more or less passive participants who incur no expenses unless they employ independent advisors (Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, pages 14-38). In this regard, we have been informed that Mr. Greenwald [sic], who controlled approximately 15 [percent] of the common stock of the Company, received and personally absorbed the cost of an evaluation of the proposed transaction insofar as it affected his interests. We know nothing of the evaluation received by Greenwall. The Main Lafrentz memorandum sets forth specific facts showing that there is a genuine issue of material fact for trial relating to the purpose and beneficiaries of petitioner's purported expenditures, given Greenwall's intimate ties with petitioner, the degree of his involvement in the merger negotiations, and the fact that the merger was in keeping with his estate planning goals. If such an evaluation was made, we should ascertain its content, and the party who in fact paid for it. If a corporation makes a distribution to a shareholder or for a shareholder's economic benefit, the distribution may be a constructive dividend to the extent of earnings and profits. Meridian Wood Products Co. v. United States,725 F.2d 1183, 1191 (9th Cir. 1984); secs. 301(a), (c)(1), and 316. The important inquiry is whether the distribution was primarily for the benefit of the shareholder. Ireland v. United States,621 F.2d 731, 735 (5th Cir. 1980); Sammons v. Commissioner,472 F.2d 449, 452↩ (5th Cir. 1972). 18. A leading commentary has this to say about expenditures which arise in the course of a corporate reorganization: If any of these costs are to be deductible, accurate records of who sustained them and the proceedings to which they relate are essential; a failure to allocate costs contemporaneously will not foreclose a later allocation by the courts, but the chances of losing on burden-of-proof grounds are increased by lack of attention to itemization, especially since these expenses are difficult to apportion under the best of circumstances. [Footnote omitted.] [B. Bittker and J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 5.07 at 5-33 (4th ed. 1979).]↩
19. This case was appealed from North Carolina National Bank v. United States, an unreported case ( W.D.N.C. 1978, 42 AFTR 2d 78↩-5866, 5867-5868, 78-2 USTC par. 9661 at 85, 192-85, 194). 20. This case was appealed from Briarcliff Candy Corporation v. Commissioner,T.C. Memo. 1972-43↩. 21. This case was appealed from Iowa-Des Moines National Bank v. Commissioner,68 T.C. 872↩ (1977).
22. Anderson v. Liberty Lobby, Inc.,54 U.S.L.W. 4755, 4759↩ (U.S. June 25, 1986), is a libel action brought by Liberty Lobby, Inc., a not-for-profit corporation and self-described "citizens' lobby," against journalist Jack Anderson and other related parties. The Supreme Court therein held, with respect to the "clear and convincing" evidence requirement on summary judgment, that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case.
23. Brief in Support of Respondent's Motion for Summary Judgment, p. 5 ↩
24. Respondent's Brief in Support of Motion for Summary Judgment, p. 12.We are also reminded of American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.,388 F.2d 272, 279 (2d Cir. 1967), in which the court stated: "The instant litigation is somewhat atypical because both parties clamor for summary judgment urging that the record presents no disputed material issue of fact -- as if a trial is to be avoided like the plague." In this case appellant sought a declaratory judgment that a television sponsoring agreement constituted a tie-in which violated Section 1 of the Sherman Act, 15 U.S.C. sec. 1. Two years after the parties filed cross-motions for summary judgment, the district court granted appellee's motion and denied appellants'. The Second Circuit reversed in view of the important and complex factual and legal disputes involved.
25. Exhibit T to Memorandum in Support of Respondent's Notice of Objection, p. 4.↩
26. Neither Bilar Tool & Die Corporation v. Commissioner,530 F.2d 708 (6th Cir. 1976), or Mills Estate v. Commissioner,206 F.2d 244 (2d Cir. 1953), were acquisitive reorganizations, and Bilar dealt with a transaction that qualified for tax-free status under sec. 368(a). Thus, the overall framework in these cases differs from the instant case. As in Bilar,↩ the plan we deal with must be looked at from the point of view of its totality. We cannot do so without the aid of additional material facts.